This opinion is subject to revision before final
publication in the Pacific Reporter

**FILED
UTAH APPELLATE COURTS
DECEMBER 31, 2015**

2015 UT 96

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Petitioner,*

*v.*

JIMMY D. GUARD,
*Respondent.*

No. 20140039
Filed December 31, 2015

On Certiorari to the Utah Court of Appeals

Fourth District, Provo Dept.
The Honorable Lynn W. Davis
No. 041404606

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen.,
Salt Lake City, for petitioner

Margaret P. Lindsay, Matthew R. Morrise, Salt Lake City,
for respondent

CHIEF JUSTICE DURRANT authored the opinion of the Court,
in which ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM,
JUSTICE HIMONAS, and JUDGE HARRIS joined.

Having recused herself due to her resignation from this court,
JUSTICE PARRISH did not participate herein;
JUDGE RYAN M. HARRIS sat.

CHIEF JUSTICE DURRANT, opinion of the Court:

### Introduction

¶1 We are asked to review the court of appeals' retroactive
application of our decision in *State v. Clopten* to Mr. Guard's case. We
issued *Clopten* while Mr. Guard's case was on direct appeal. In
*Clopten*, we held that "in cases where eyewitnesses are identifying a

stranger and one or more established factors affecting accuracy are present, the testimony of a qualified expert is both reliable and helpful, as required by rule 702."[1] Prior to *Clopten*, there was a "de facto presumption against the admission of eyewitness expert testimony," and courts generally relied on jury instructions to address this issue.[2] Mr. Guard's motion to put on an expert on eyewitness testimony was denied because he failed to establish that such testimony was reliable, but the jury was instructed on the possible issues surrounding eyewitness testimony. The jury found Mr. Guard guilty of kidnapping, and he was subsequently sentenced to a prison term of ten years to life. Mr. Guard timely appealed his conviction, but his appeal was delayed due to his attorney's failure to file a docketing statement.

¶2　In deciding whether to apply *Clopten* retroactively, the court of appeals acknowledged our "clear break" rule regarding retroactive application of new rules of criminal procedure to cases on direct review, but declined to apply it. Rather, the court concluded that the "unusual circumstances" in this case required the retroactive application of our rule in *Clopten*.[3] The court reasoned that, because the cases were very similar and were tried around the same time, if Mr. Guard's case had not been delayed, *Guard* and *Clopten* would "almost inevitabl[y] . . . have been either consolidated on appeal or treated as companion cases" and the result in *Guard* "would have been identical to the result in *Clopten*."[4] Thus the court stated, "it seems inconsistent with the administration of justice to deny Guard the benefit of the supreme court's approach in *Clopten* where, but for the happenstance that delayed Guard's appeal, it appears to us that the same analysis would have been applied to both cases."[5] The court therefore applied the rule in *Clopten*, holding that it was harmful error for the trial court not to admit Mr. Guard's eyewitness expert.

¶3　The State appealed. It argues that *Clopten* was a "clear break" from our previous caselaw on the admissibility of eyewitness expert testimony and should not have been applied retroactively. The State also argues that Mr. Guard did not preserve the issue. Mr. Guard counters that the court of appeals did not apply *Clopten*

---

[1] 2009 UT 84, ¶ 49, 223 P.3d 1103.

[2] *Id.* ¶ 30.

[3] *State v. Guard*, 2013 UT App 270, ¶ 18, 316 P.3d 444.

[4] *Id.*

[5] *Id.* ¶ 19.

retroactively (but merely found it persuasive), that *Clopten* was not a "clear break," and that Mr. Guard adequately preserved the issue.

¶4 We reverse. We conclude that Mr. Guard adequately preserved the issue. We decline to decide whether *Clopten* was a "clear break" (and therefore should not have been given retroactive application) because we conclude that our "clear break" rule is flawed and therefore abandon it. Instead, we return to our prior precedent–new rules of criminal procedure announced in judicial opinions are applicable retroactively to all cases pending on direct review at the time the new rule is announced.

¶5 After determining that *Clopten* applies retroactively to Mr. Guard's case, we then address whether the trial court abused its discretion under the *Clopten* standard when it failed to admit Mr. Guard's eyewitness expert. We conclude that it was not an abuse of discretion for the trial court to deny Mr. Guard's motion to admit eyewitness expert testimony under *Clopten*, and thus we reverse the court of appeals' decision.

**Background**

¶6 On November 15, 2004, C.M., who was nine years old at the time, was attacked as she walked the few blocks from her school bus stop to her home. After she had parted ways with her friends, crossed the street, and reached the corner of her apartment complex, a male stranger grabbed her from behind. He held C.M.'s arms behind her back, covered her mouth, and told her to come with him or he would harm her with a knife. C.M. never saw a knife. She fought off her attacker using techniques she had learned through a self-defense course offered at her school. She kicked him in the shin, causing him to loosen his grip. She then turned around and poked him repeatedly in the eyes and face. He tried to avoid her jabs and hit her back. The stranger then released her, and she ran straight home to her mother. As she ran home, she looked back and saw the stranger running in the opposite direction. C.M. recounted the attack to her mother, who called the police.

¶7 The police responded to C.M.'s home. Officer Becerra was the first officer on the scene and the first to interview C.M. about her kidnapping. She described her attacker to Officer Becerra as a "Hispanic male with curly black hair and a faded beard and mustache" who was "wearing white shoes, jeans, a black T-shirt with a picture of the wrestler 'Stone Cold' on it, and a black baseball cap." When Officer Becerra asked C.M. if she could remember her

attacker's face, she said "I don't know. I saw the shoes," and "I saw the pants."

¶8 Detective William Devon Jensen arrived at C.M.'s home a short while later and took over the interview, as he had more training and experience interviewing children. Detective Jensen took time to calm C.M. down and took special care not to lead her, using non-suggestive questions. C.M. described her attacker as "slightly chubby, . . . dark complected, possibly Hispanic" and said he "was wearing a black baseball cap with the letter 'A' on it, . . . a black shirt with 'Stone Cold' on the front of it, blue jeans, and white tennis shoes." She described her assailant as taller than Officer Becerra, but shorter than Detective Jensen, a range from 5'7'' to 6'1''. She also said he had hair like her brother, who had a short Afro. Detective Jensen asked C.M. if she would be able to recognize her attacker. She said she thought she would be able to identify him if she saw him again.

¶9 The following day, Detective Jensen went to C.M.'s school to show her a photo array of six men who generally matched her description of her attacker. The Defendant, Jimmy Guard, was included in the photo array. Detective Jensen had included Mr. Guard after he saw his picture on a "person of interest" bulletin that described a similar kidnapping incident in Springville, Utah. Detective Jensen did not tell C.M. that her attacker was among those pictured, but she understood that he would be. Detective Jensen showed C.M. the photos one at a time and asked her to look at each photo and tell him whether any of them was the person who had kidnapped her the day before. C.M. looked at the first two photos and told the detective they were not her attacker. But when C.M. was presented with the third picture "[h]er eyes got big, she appeared excited and scared at the same time[,] and she immediately said, 'That's him. That's him.'" Detective Jensen asked whether she was sure the man pictured was her attacker, and she said "Yes, I'm sure that's him." The detective then showed C.M. the remaining three pictures, and she said none of them was of her attacker.

¶10 Through his investigation, Detective Jensen found three witnesses who identified Mr. Guard as the kidnapper. On the day of the attack, he interviewed a friend of C.M.'s who saw the abduction from about a block away. C.M's ten-year-old friend told Detective Jensen that she had seen the assailant grab C.M., that she initially thought that the assailant was C.M.'s brother, and that he was wearing blue pants, a black shirt, a cap, and white shoes.

¶11 The day after the attack, Detective Jensen found two witnesses through a canvass of C.M.'s neighborhood, where he spoke with fifteen to twenty people. He took Mr. Guard's photo with

him that day and asked people in the neighborhood whether they had seen Mr. Guard the day before. Two neighbors said they had seen Mr. Guard: Darwin Goode, who said he saw Mr. Guard loitering and then following a group of girls, and Kathleen Spechard, who believed she saw him run past her home.

¶12  Mr. Goode, who lived two blocks from the kidnapping, said he saw Mr. Guard the previous day standing by a UTA bus stop that was about 100 feet from his home.[6] He was out watering his lawn when he noticed Mr. Guard at the UTA bus stop. At first he did not notice anything unusual, as Mr. Guard "was just kind of . . . hanging around the bus stop."

¶13  But Mr. Goode became suspicious when Mr. Guard did not board the UTA bus that had stopped for him. He said Mr. Guard remained at the bus stop for half an hour until a school bus let out a group of children at the curb in front of his home. He then observed Mr. Guard follow a group of three girls as they walked past his house on the opposite side of the street. He did not see Mr. Guard approach or grab any of the children.

¶14  Ms. Spechard believed she had seen Mr. Guard run past her home, which is a block from the site of the attack, sometime between 3:15 p.m. and 3:45 p.m. while she was waiting for her children to come home from school. She took note of the man running past her home because he was not dressed for running and her street was not popular with runners as it was a dead end. When asked whether the man she saw running past her home was the man in the photo, she said that she "couldn't say for positive," but the man in the photo "certainly looked like the man" she had seen the previous day.

¶15  On November 17, two days after the kidnapping, Detective Jensen arrested Mr. Guard at his residence, which was about a mile from the site of the kidnapping. Detective Jensen also searched Mr. Guard's residence for clothing that matched the description given by C.M. He did not find the baseball cap with the "A" on it or the black T-shirt with "Stone Cold" Steven Austin. He did find a pair of light blue running shoes in Mr. Guard's bedroom.

¶16 During an interview with Detective Jensen, Mr. Guard claimed to have an alibi for the time of the kidnapping. He claimed to have gone to Salt Lake City on the afternoon of November 15, visiting several Barnes & Noble bookstores and the Salt Lake City library. Mr. Guard, who was having financial trouble at the time,

---

[6] Investigators later measured the distance as 245 feet.

said he spent the afternoon researching bankruptcy. He claimed to first have visited the Barnes & Noble stores in Sandy and Murray, where he had brief interactions with employees.

¶17 After failing to find the material he was looking for, Mr. Guard claimed he went to the Salt Lake City library, where he spent a significant amount of time browsing the law books, reading the bankruptcy code book, having a coffee, and perusing the art display. During his time at the library, Mr. Guard said he interacted with a female library employee, asking her for help locating a code book, and also spoke with a female employee at the coffee shop, from whom he purchased a coffee. Mr. Guard claimed he next went to the Barnes & Noble in Sugarhouse, where he also had passing interactions with employees.

¶18 A week after the kidnapping, Detective Jensen investigated Mr. Guard's alibi. The detective went to the bookstores and the library, showing employees a photo of Mr. Guard and asking whether they recognized or remembered him. None of the employees remembered seeing Mr. Guard. He also talked with a female employee at the coffee shop where Mr. Guard claimed to have purchased a coffee. Although she was working on the afternoon of November 15, she did not remember seeing Mr. Guard or serving him a coffee.

¶19 Detective Jensen also reviewed the surveillance video from the Salt Lake City library but did not see anyone who looked like Mr. Guard. A private investigator viewed the surveillance video as well and testified at trial that she believed the video showed Mr. Guard entering the library. The video was not introduced, as it had been overwritten. The library staff had printed three still images, however, one of which the private investigator claimed depicted Mr. Guard. The images were admitted at trial.

¶20 At trial, Mr. Guard filed (1) a motion to suppress C.M.'s eyewitness identification of him, both through the photo lineup and at trial and (2) a notice of intent to call Dr. David H. Dodd as an expert witness to "testify concerning the full range of cognitive processes associated with the eyewitness, including attention, perception and memory." The State opposed these filings in a Motion to Exclude Defendant's Expert Witness. The trial court conducted two hearings in this regard. First, it held a hearing on Mr. Guard's motion to suppress (motion hearing); and second, it held a *Rimmasch* hearing.

¶21 At the motion hearing, the court heard oral argument from both sides and denied Mr. Guard's motion to suppress. This hearing

focused on the reliability of C.M.'s identification of Mr. Guard, including issues surrounding the reliability of the photo lineup. During the hearing, the State expressed confusion about whether Dr. Dodd's proposed testimony would focus on the specifics of C.M.'s identification, which the State contended would be "inappropriate," or would focus on problems with eyewitness identifications generally. The trial court expressed similar confusion and a willingness to let in expert testimony as to eyewitness reliability generally, stating that "this Court could allow that expert testimony to come in." The State argued that this type of general testimony was "perhaps" admissible and called for a *Rimmasch*[7] hearing under rule 702 of the Utah Rules of Evidence. Mr. Guard stated that he believed Dr. Dodd's testimony should be admissible given his credentials, but "if *Rimmasch* is needed, then we'll move forward in that direction." The trial court agreed with the State and so denied the motion to suppress but allowed Mr. Guard to renew his motion at the *Rimmasch* hearing, where the court would reconsider the issue.

¶22 At the *Rimmasch* hearing, Dr. Dodd testified about his expertise in the area of eyewitness identification and specifically about C.M.'s identification of Mr. Guard and the photo lineup used to identify him. After Dr. Dodd testified extensively on these issues, the State and the trial court again indicated confusion about how the Defendant intended to use the witness. Mr. Guard clarified that he intended to use Dr. Dodd in two possible ways. First, he intended to use the witness to exclude C.M.'s identification of Mr. Guard entirely. Also, he intended to call Dr. Dodd as an expert on eyewitness identification reliability generally, with no specific testimony about C.M.'s identification. Mr. Guard then offered to

---

[7] *See State v. Rimmasch*, 775 P.2d 388, 398, 398 n.7–8 (Utah 1989) (requiring (1) "a showing of the inherent reliability of the underlying principles or techniques," (2) the principles or techniques have been properly applied to the facts of the case by a qualified expert, and (3) the probative value of the evidence outweighs any prejudicial impact under rule 403, in order to meet rule 702). We note that rule 702 was amended in 2007, and those amendments subsumed the *Rimmasch* standard. Mr. Guard was tried under the old rule. We have held, however, that the old "Rule 702 plus *Rimmasch*" standard and the current rule yield the same results when applied to eyewitness testimony. *State v. Clopten*, 2009 UT 84, ¶¶ 37–38, 223 P.3d 1103. Therefore, we proceed with our analysis under the current version of rule 702. The stylistic changes made to rule 702 in 2011 also do not affect our analysis.

provide a two-page synopsis explaining his intended use of Dr. Dodd so that the State could properly respond. He never provided this synopsis.

¶23 The trial court made two rulings. First, it issued a written ruling denying the Defendant's motion to suppress C.M.'s identification of her attacker. In this ruling, the court found that C.M.'s eyewitness testimony met the five factors set out in *State v. Ramirez*.[8]

¶24 Second, based on the *Rimmasch* hearing, the court granted the State's motion to exclude Dr. Dodd's testimony under rule 702 and chose instead to provide a *Long* instruction. While the court orally made this ruling at or just prior to trial, which started on May 15, 2006, it did not issue its written ruling until November 9, 2006. The court prepared the written ruling from the notes it had made before its May ruling from the bench. In this written ruling, the court concluded that Mr. Guard had failed to meet the threshold requirement of the *Rimmasch* standard, in that he had failed to establish the "inherent reliability of the underlying principles or techniques."[9] Specifically, the court found that "the Defendant's presentation relative to the legitimacy of the science underlying Dr. Dodd's testimony [was] woefully inadequate." The court cited Mr. Guard's failure to present "other experts supporting Dr. Dodd's assertions, or testimony summarizing peer-reviewed studies supporting the methods which Dr. Dodd employed." The trial court also relied heavily on *State v. Butterfield*,[10] where we stated that trial courts were not required to admit expert testimony on potential issues with eyewitness identification, but could instead rely on a *Long* instruction.[11]

---

[8] 817 P.2d 774, 781 (Utah 1991) ("(1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event . . . ; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly." (alteration in original) (internal quotation marks omitted) (quoting *State v. Long*, 721 P.2d 483, 493 (Utah 1986)).

[9] *See Rimmasch*, 775 P.2d at 398.

[10] 2001 UT 59, 27 P.3d 1133.

[11] *Id.* ¶¶ 27, 41−44.

¶25 Mr. Guard was found guilty of child kidnapping, a first degree felony, and sentenced to ten years to life. He filed a timely appeal, which was dismissed for failure to file a docketing statement. More than three years later, in July 2010, the district court reinstated his right to appeal. The case was transferred to the court of appeals, which reversed the trial court's decision, finding that the unusual circumstances of the case called for the retroactive application of our decision in *State v. Clopten*.[12]

¶26 In *Clopten*, we held that where a witness is identifying a stranger, expert eyewitness testimony meets the requirements of rule 702 if certain established factors affecting accuracy are present.[13] In deciding whether to apply *Clopten* retroactively, the court of appeals acknowledged our "clear break" rule regarding retroactive application of new rules of criminal procedure to cases pending on direct review, but declined to apply it. Instead of addressing the question of whether *Clopten* was a "clear break" from the prior rule on eyewitness expert testimony, the court decided that the "unusual circumstances" in this case—the eyewitness issues in Mr. Guard's case were very similar to those in Mr. Clopten's case and the cases were tried around the same time—required the retroactive application of our rule in *Clopten*.[14] The court reasoned that because of these similarities, if not for the delay in Mr. Guard's appeal, the two cases would "almost inevitabl[y] . . . have been either consolidated on appeal or treated as companion cases" and we would have decided *Guard* in the same manner we decided *Clopten*.[15] The court of appeals stated that "it seems inconsistent with the administration of justice to deny Guard the benefit of the supreme court's approach in *Clopten* where, but for the happenstance that delayed Guard's appeal, it appears to us that the same analysis would have been applied to both cases."[16] The court then applied the rule in *Clopten*, holding that the district court had abused its discretion in excluding the eyewitness expert testimony and instead relying upon a *Long* instruction.[17] We granted the State's petition for

---

[12] *State v. Guard*, 2013 UT App 270, ¶¶ 15−19, 316 P.3d 444; *see also State v. Clopten*, 2009 UT 84, 223 P.3d 1103.

[13] *Clopten*, 2009 UT 84, ¶ 32.

[14] *Guard*, 2013 UT App 270, ¶¶ 15−19.

[15] *Id.* ¶ 18.

[16] *Id.* ¶ 19.

[17] *Id.* ¶¶ 20–27.

writ of certiorari. We have jurisdiction under Utah Code section 78A-3-102(5).

## Standard of Review

¶27 The State raises two issues in its appeal. First, it claims the court of appeals erred in applying our holding in *Clopten* retroactively to Mr. Guard's case, which was tried three and a half years before *Clopten* was decided. Whether a new rule applies retroactively is a question of law reviewed for correctness.[18] Second, if *Clopten* does apply retroactively, the State asks us to decide whether Mr. Guard properly preserved his challenge to the trial court's decision. This issue is also reviewed for correctness.[19]

## Analysis

¶28 As a threshold matter, we conclude that Mr. Guard adequately preserved the issue of whether his proposed eyewitness expert testimony should have been admitted as reliable and, thus, whether *Clopten* should have been applied retroactively. The State argues that Mr. Guard did not adequately preserve this issue for appeal because he failed to clearly argue that judicial notice was appropriate, failed to provide a two-page synopsis to the court, and failed to vigorously press for the admission of his expert. While these shortcomings are relevant to whether the trial court abused its discretion in granting the State's motion to exclude Dr. Dodd's testimony (as we discuss in Part II), they do not dictate the conclusion that the issue of admissibility of eyewitness expert testimony was unpreserved.

¶29 In order to preserve an issue for appeal, a party must present the issue in the trial court.[20] The issue must be "specifically raised, in a timely manner, and must be supported by evidence and relevant legal authority."[21] Although his advocacy was less than ideal, Mr. Guard did enough to satisfy the requirements of preservation. The issue—the reliability and thus the admissibility of expert testimony concerning problems with eyewitness identification—was specifically raised. Mr. Guard filed a notice that he intended to call Dr. Dodd to "testify concerning the full range of

---

[18] *Cf. State v. Lusk*, 2001 UT 102, ¶ 11, 37 P.3d 1103 (holding that whether a statutory amendment applied retroactively was a question of law reviewed for correctness).

[19] *Cf. id.*

[20] *Donjuan v. McDermott*, 2011 UT 72, ¶ 20, 266 P.3d 839.

[21] *Id.*

cognitive processes associated with the eyewitness, including attention, perception and memory." The State addressed this notice in a Motion to Exclude Defendant's Expert Witness. Mr. Guard opposed the State's motion, and the trial court ruled on the reliability of Dr. Dodd's proposed testimony following a *Rimmasch* hearing on the issue. At the *Rimmasch* hearing, Dr. Dodd testified generally about issues that can affect the accuracy of eyewitness testimony, including cross-racial identifications,[22] age,[23] level of stress,[24] and the level of confidence of the witness's identification.[25] But the trial court found that "the Defendant [had] failed to marshal evidence supporting the legitimacy and the reliability of the science Dr. Dodd intended to employ," and thus "the proposed expert testimony of Dr. Dodd had not been demonstrated to be reliable." Because Mr. Guard raised the issue of the admissibility of eyewitness expert testimony and argued for the admission of such testimony at the *Rimmasch* hearing, and the trial court subsequently ruled on this issue, we conclude that the issue was adequately preserved.[26]

---

[22] Dr. Dodd testified that "[t]here are other issues, such as we know that cross-racial identifications are more difficult than within racial identifications." The court also seemed to acknowledge problems with cross-racial identification.

[23] Dr. Dodd testified that "[t]he age of the witness makes a big difference" and that "it turns out that . . . before adolescence . . . as the witness gets older they get better, but it's adolescence before they get to the level of an adult . . . ."

[24] Dr. Dodd testified that "the other issue of stress we know from multiple studies that to the extent people are upset . . . they . . . fail to fully process the information that is available to them."

[25] Dr. Dodd testified that the confidence expressed by the witness "is relevant but is not as powerful as generally presumed" and that "the correlation between certainty and accuracy is often very small." He made these statements "based on the research literature."

[26] Although we hold that Mr. Guard's claim was preserved under our traditional preservation doctrine, we note the tension between preservation and retroactivity. *See, e.g.,* Aaron-Andrew P. Bruhl, *Deciding When to Decide: How Appellate Procedure Distributes the Costs of Legal Change*, 96 CORNELL L. REV. 203, 213−14 (2011) (noting that "[a]s a practical matter, the application of plain error review in the changed-law context significantly erodes our theoretical commitment to applying new law retroactively to pending cases"). We further note that under federal law a litigant is required to meet

¶30 Having concluded that Mr. Guard preserved the issue of the admissibility of eyewitness expert testimony, we turn to the substance of his appeal. Below, we first discuss the serious flaws in the "clear break" rule and ultimately abandon that rule. We revert to our previous rule, which provides for retroactive application to all cases pending on direct review of new rules of criminal procedure announced in judicial decisions. We decline to address whether *Clopten* was a "clear break" under our prior caselaw. This issue is now moot. Under the rule announced herein, *Clopten* applies to Mr. Guard's case because *Clopten* was announced while Mr. Guard's case was on direct appeal.[27] Second, in applying *Clopten* to Mr. Guard's

---

the plain error exception to the preservation doctrine in order for the new rule to apply retroactively. *See Johnson v. United States*, 520 U.S. 461, 466–67 (1997). But instead of asking whether the trial court's decision was "plain" error under the rule in place at the time of the trial, the federal court instead asks whether the trial court's decision would have been plain error under the rule in place at the time of the appeal. *Id.* at 468 ("We . . . hold that in a case such as this—where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration."). We do not address whether and how our preservation rules should be modified with respect to retroactivity, as this issue was not presented by the parties and the issue presented in this case was adequately preserved under our traditional preservation doctrine.

[27] Generally, a conviction becomes "final" for purposes of our retroactivity analysis when the defendant's right to direct appeal "has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *See Beard v. Banks*, 542 U.S. 406, 411 (2004) (internal quotation marks omitted). Mr. Guard was convicted on May 15, 2006, and timely appealed. In February 2007, his case was dismissed for failure to file a docketing statement. Mr. Guard never waived his right to an appeal nor did he request that his appeal be withdrawn. He was unaware that his appeal had been dismissed and sought reinstatement of his right to appeal under *Manning v. State* in June 2010. 2005 UT 61, ¶ 31, 122 P.3d 628. On July 30, 2010, the district court granted his request and reinstated his appeal. Therefore, when *Clopten* issued in December 2009, Mr. Guard's case had technically been dismissed. But because Mr. Guard was improperly denied his right to appeal, which was subsequently reinstated, we treat his case as pending on direct review at the time our new rule in *Clopten* was announced.

case, we conclude that the trial court did not abuse its discretion when it excluded Dr. Dodd's expert testimony. We therefore reverse the court of appeals' decision.

## I. We Abandon the "Clear Break" Rule and Instead Apply New Rules of Criminal Procedure Retroactively to All Cases Pending on Direct Review

¶31 Mr. Guard argues that *Clopten* is not a "clear break" from the previous rule on eyewitness expert testimony for two reasons: (1) *Clopten* did not contain an express or implied declaration that it was to be applied prospectively only, and (2) *Clopten* only clarified "how eyewitness expert testimony fits into the Utah Rules of Evidence" and did not work a fundamental shift in the law.[28] In *Clopten,* we recognized that our previous holdings[29] had "created a de facto presumption against the admission of eyewitness expert testimony" and in favor of a *Long* jury instruction.[30] We moved away from this presumption, however, stating that "in cases where eyewitnesses are identifying a stranger and one or more established factors affecting accuracy are present, the testimony of a qualified expert is both reliable and helpful, as required by rule 702."[31] Here, we decline to decide whether *Clopten* was a "clear break" because we conclude that the "clear break" rule is seriously flawed and so abandon it in favor of a rule of retroactive application to all cases pending on direct review of new rules of criminal procedure announced in judicial decisions.

¶32 Mr. Guard invites our reexamination of the "clear break" rule, asserting that our current caselaw "has turned the 'clear break' exception into a leviathan that has swallowed the rule of automatic retroactivity." Below, we discuss the serious flaws in the "clear break" rule and conclude that this rule is neither persuasive nor firmly established and thus abandon it in favor of a rule of automatic retroactivity.

¶33 Abandoning our "clear break" rule requires us to overrule our use of this doctrine in several cases. We have recognized stare

---

[28] *State v. Clopten*, 2009 UT 84, ¶ 30, 223 P.3d 1103.

[29] Such decisions included *State v. Hubbard*, 2002 UT 45, ¶ 17, 48 P.3d 953, and *State v. Butterfield*, 2001 UT 59, ¶ 44, 27 P.3d 1133.

[30] *Clopten*, 2009 UT 84, ¶ 30.

[31] *Id.* ¶ 49.

decisis as "a cornerstone of Anglo-American jurisprudence."[32] And "[b]ecause [it] is so important to the predictability and fairness of a common law system, we do not overrule our precedents 'lightly.'"[33] The doctrine of stare decisis, however, "is neither mechanical nor rigid as it relates to courts of last resort."[34] Further, "our presumption against overruling precedent is not equally strong in all cases," and some precedents are weightier than others.[35]

¶34 We have an established body of law regarding the weight we give to our precedent. Generally, we analyze two broad factors in assessing the strength of our precedent.[36] First, we look to "the persuasiveness of the authority and reasoning on which the precedent was originally based."[37] Second, we analyze "how firmly the precedent has become established in the law since it was handed down."[38] In analyzing how firmly established precedent has become, we have looked to a range of considerations, "including the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned."[39] We abandon the "clear break" rule because it is neither persuasive nor firmly established.

¶35 Below, we first frame our discussion with an overview of the "clear break" rule and its place in our retroactivity caselaw. Next, we discuss why the "clear break" rule should be overturned as unpersuasive and not firmly established. Finally, we return to our previous rule applying new rules of criminal procedure announced in judicial decisions retroactively to all cases pending on direct review.

---

[32] *Eldridge v. Johndrow*, 2015 UT 21, ¶ 21, 345 P.3d 553 (internal quotation marks omitted).

[33] *Id.* (citation omitted).

[34] *State v. Menzies*, 889 P.2d 393, 399 (Utah 1994).

[35] *Eldridge*, 2015 UT 21, ¶ 22.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

*A. The "Clear Break" Rule and Its Place in Our Retroactivity Caselaw*

¶36 Generally, courts apply a new judicially announced rule of criminal procedure retroactively to cases on direct appeal.[40] Such retroactive application is required when the new rule is constitutionally based.[41] But we have recognized some exceptions to this general rule of retroactive application in the context of changes to criminal procedure that have no constitutional basis, such as when a new rule is declared to apply only prospectively[42] or when a new rule is a "clear break" from the previous rule.[43] A rule is a "clear break" from the old rule when "it cause[s] an abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replace[s] an older one."[44] A "clear break" also "occurs when a decision disapproves a practice this Court arguably has sanctioned in prior cases."[45] Therefore, the "clear break" rule is an exception to the general rule that new rules of criminal procedure announced in judicial decisions are applied retroactively to cases pending on direct review.

¶37 Because the issue of whether a rule is applied retroactively hinges on many factors, we emphasize that in this opinion we address only the retroactive application of new rules of criminal

---

[40] *See, e.g., State v. Belgard*, 615 P.2d 1274, 1276 (Utah 1980); *State v. Norton*, 675 P.2d 577, 583−84 (Utah 1983).

[41] *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) (making clear that the "clear break" rule no longer applies to new constitutional rules of criminal procedure); *State v. Baker*, 2010 UT 18, ¶ 24, 229 P.3d 650 (applying a new constitutional rule retroactively to a case on direct review because "*Griffith v. Kentucky* eliminated the 'clear break' exception to retroactive application of newly declared constitutional rules for cases pending on direct review"); *State v. Stilling*, 770 P.2d 137, 143 (Utah 1989) (recognizing the rule announced in *Griffith* but refusing to apply Long retroactively because "[w]e decided *Long* on neither federal nor state constitutional principles, but rather as a result of our supervisory capacity over the lower courts").

[42] *See Norton*, 675 P.2d at 584; *see also Stilling*, 770 P.2d at 143 (refusing to apply *State v. Long* retroactively when *Long* explicitly stated it applied prospectively only).

[43] *See, e.g., State v. Lovell*, 2011 UT 36, ¶ 73, 262 P.3d 803.

[44] *Id.* (internal quotation marks omitted).

[45] *Id.* (internal quotation marks omitted).

procedure, including those that are not constitutionally based, announced in judicial decisions. And we consider the retroactive application of these new rules only as applied to cases pending on direct review at the time the new rule was announced. We say nothing about the retroactive application of judicially announced new rules of criminal procedure to post-conviction proceedings,[46] the application of statutory changes in criminal law,[47] or the retroactive application of of new rules of criminal procedure that result from our ruling-making process.[48]

### B. The "Clear Break" Rule Rests on Overruled Authority and Weak Reasoning

¶38 Having put our decision in context, we now address the flaws in the "clear break" rule exception in light of the factors we have established for determining whether to overrule precedent. The first factor we consider when assessing the strength of precedent is "the persuasiveness of the authority and the reasoning on which the precedent was originally based."[49] We have found precedent less weighty when it rests on insufficient or weak authority[50] and when it does not "weigh[] all the arguments and reach[] a reasoned

---

[46] *See Winward v. State*, 2015 UT 61, ¶¶ 10−12, 355 P.3d 1022 (discussing retroactivity under our Post-Conviction Remedies Act).

[47] *See, e.g., Beaver Cty. v. Utah State Tax Comm'n*, 2010 UT 50, ¶ 10, 254 P.3d 158 ("In Utah, there is a long-standing rule . . . that a legislative enactment which alters the substantive law . . . will not be read to operate retrospectively unless the legislature has clearly expressed that intention. However, the rule against retroactive application does not apply where a statute changes only procedural law by providing a different mode or form of procedure for enforcing substantive rights without enlarging or eliminating vested rights." (alterations in original) (internal quotation marks omitted)).

[48] *See* UTAH CODE OF JUD. ADMIN. 11-105(4) ("Rules shall become effective 60 days after adoption by the Supreme Court unless otherwise ordered.").

[49] *Eldridge*, 2015 UT 21, ¶ 22.

[50] *See id.* ¶ 28 ("To begin with, *Pratt*'s application of improper-purpose liability was based entirely on *Leigh Furniture*, without any discussion of other authority.")

conclusion."[51] Here, our "clear break" rule was based on weak precedent and was not well-reasoned.

## 1. The "Clear Break" Rule is Rooted in Weak Precedent That has Since Been Overruled

¶39 First, our "clear break" rule was based on weak federal precedent that has since been abandoned. That precedent created an ill-advised exception to the longstanding rule of automatic retroactivity. Prior to adopting the "clear break" rule, we automatically applied new judicially announced rules of criminal procedure to cases pending on direct review. In *State v. Belgard*, we explained that "when a lower court relies on a legal principle which [has] changed . . . prior to direct review, an appellate court must apply the current law rather than the law as it existed at the time the lower court acted."[52] We subsequently affirmed our holding in *Belgard* but stressed that the "automatic rule of retroactivity only applies by its terms to criminal cases pending on direct review when the rule is changed."[53]

¶40 But in *State v. Norton*, we adopted the "clear break" rule exception to the general rule of automatic retroactivity, citing exclusively to federal precedent that has since been overruled. In *Norton*, we stated that "a new rule of criminal procedure which constitutes 'a clear break with the past' will sometimes be nonretroactive" and cited to *United States v. Johnson*.[54] We stated that "[t]his qualification is necessary to prevent automatic retroactivity from displacing the traditional rule that a new rule of criminal procedure" that is a "clear break" from the previous rule is not retroactive.[55] But far from being the "traditional rule," the "clear break" rule was an exception announced by the U.S. Supreme Court

---

[51] *Id.*; *see also Menzies*, 889 P.2d at 399 (noting that in establishing *Crawford*'s per se rule, the court "not only failed to explain why [it] was abandoning the long-established *Hopt* rule, but failed to cite that line of cases altogether" and established the new rule "with little analysis and without reference to authority" (citation omitted)).

[52] 615 P.2d at 1276 (internal quotation marks omitted).

[53] *Norton*, 675 P.2d at 583.

[54] *Id.* at 584.

[55] *Id.*

in 1982 to the general rule of automatic retroactivity and then abandoned by that Court only five years later.[56]

¶41 In *Johnson*, the U.S. Supreme Court announced the "clear break" rule in an ultimately failed attempt to address serious concerns about the case-by-case nature of its retroactivity determinations. In that case, the Court discussed concerns raised by Justice Harlan about the balancing test it had adopted in *Linkletter v. Walker*[57] and elaborated on in *Stovall v. Denno*.[58] Under the rule in *Stovall*, the Court balanced three factors to determine whether a "new" constitutional rule should be given retroactive effect both to cases on direct review and to cases that were final.[59] These factors included: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."[60]

¶42 The Court in *Johnson* then discussed problems presented by the *Stovall* balancing test in the context of new constitutional rules. First, the Court concluded that this case-by-case analysis had created precedent that was difficult to follow.[61] Next, the Court noted Justice Harlan's critique of the case-by-case analysis. He was concerned that the balancing test "violated three norms of constitutional adjudication": (1) it "conflict[ed] with the norm of principled decisionmaking"; (2) it allowed for "a 'new' constitutional rule [to apply] entirely prospectively, while making an exception only for the particular litigant whose case was chosen as the vehicle for

---

[56] *See United States v. Johnson*, 457 U.S. 537, 550−51 (1982) (announcing the "clear break" exception); *Griffith*, 479 U.S. at 328 (abandoning the "clear break" exception).

[57] 381 U.S. 618 (1965).

[58] 388 U.S. 293 (1967).

[59] *Davis v. United States*, 131 S. Ct. 2419, 2430 (2011) (noting that the *Linkletter* analysis was originally applied to cases on collateral review but was extended to cases on direct review the next year).

[60] *Johnson*, 457 U.S. at 544.

[61] *Id.* (noting that "for some, the subsequent course of *Linkletter* [following the adoption of the *Stovall* factors] became almost as difficult to follow as the tracks made by a beast of prey in search of its intended victim" (internal quotation marks omitted)).

establishing that rule"; and (3) it "departed from the principle of treating similarly situated defendants similarly."[62]

¶43 After noting the problems presented by the *Stovall* balancing test, instead of jettisoning the test altogether as the Court eventually did in *Griffith v. Kentucky*,[63] the Court chose to limit the application of the *Stovall* factors in a way that did not offend its precedent. It noted "three narrow categories of cases" where "the answer to the retroactivity question has been effectively determined, not by application of the *Stovall* factors, but rather, through application of a threshold test."[64]

¶44 The "clear break" rule we cite in *Norton* emerged from one of these "narrow categories of cases."[65] In the "clear break" category of precedent, the Court explained that where it had "expressly declared a rule of criminal procedure to be 'a clear break with the past,'" it had "almost invariably . . . gone on to find such a newly minted principle nonretroactive."[66] The Court said that when a "new rule was unanticipated, the second and third *Stovall* factors—reliance by law enforcement authorities on the old standards and effect on the administration of justice . . . of the new rule—have virtually compelled a finding of nonretroactivity."[67]

¶45 Just five years after articulating this "clear break" rule in *Johnson*, however, the U.S. Supreme Court abandoned the rule as to cases pending on direct review. Instead, the Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule

---

[62] *Id.* at 546–47 (Justice Harlan wrote separately to expresses these concerns in *Desist v. United States*, 394 U.S. 244, 256–58 (1969) and *Mackey v. United States*, 401 U.S. 667, 675–702 (1971)).

[63] 479 U.S. at 327.

[64] *Johnson*, 457 U.S. at 548.

[65] *Id.* at 548–50 (in addition to the "clear break" rule, the three threshold "categories" also included situations "when a decision of this Court merely has applied settled precedents to new and different factual situations" and when there is "a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place").

[66] *Id.* at 549 (citation omitted).

[67] *Id.* at 549–50.

constitutes a 'clear break' with the past."[68] The Court abandoned the "clear break" rule for reasons very similar to those it cited when limiting the application of the *Stovall* factors in *Johnson*. It again cited to Justice Harlan's previous dissents[69] and found the "clear break" rule was inappropriate because (1) it undermined "the principle that this Court does not disregard current law[] when it adjudicates a case pending before it on direct review" and (2) it "create[d] the same problem [as the *Stovall* factors] of not treating similarly situated defendants the same."[70] While there has been some dispute in the federal courts over whether *Griffith* applies to new federal rules that are not constitutionally based,[71] we have clearly confined *Griffith* to the constitutional context.[72]

¶46 After we cited the "clear break" rule in *Norton*, we went on to apply it in several cases, including *State v. Hoff*,[73] *State v. Gordon*,[74]

---

[68] *Griffith*, 479 U.S. at 328.

[69] *See Mackey*, 401 U.S. at 675–702 (Harlan, J., concurring in part and dissenting in part); *Desist*, 394 U.S. at 256–58 (Harlan, J., dissenting).

[70] *Griffith*, 479 U.S. at 326–27.

[71] *Compare United States v. Lopez-Pena*, 912 F.2d 1542, 1545 (1st Cir. 1989) (concluding that "nothing in *Griffith*, either in terms or purport, distinguish[es] between constitutional and statutory interpretations"), *with Diggs v. Owens*, 833 F.2d 439, 442 (3d Cir. 1987) ("*Griffith* should be confined to constitutional rules of criminal procedure and thus does not require retroactive application of new procedural decisions not constitutionally grounded.").

[72] *See Stilling*, 770 P.2d at 143 (refusing to apply *Griffith v. Kentucky* when the new rule of criminal procedure was decided "on neither federal nor state constitutional principles, but rather as a result of our supervisory capacity over the lower courts").

[73] 814 P.2d 1119, 1123 (Utah 1991) (refusing to apply a rule retroactively when "[t]he strict compliance rule announced in *Gibbons* was . . . a clear break with this Court's rulings in previous cases dealing with the validity of guilty pleas").

[74] 913 P.2d 350, 354 (Utah 1996) (holding that "our decision in *Brown* announced for the first time that counsel with concurrent prosecutorial duties could not represent indigent defendants" was "a clear change from past procedures" and thus a clear break and not retroactive).

*State v. Baker*,[75] and most recently in *State v. Lovell*.[76] In these cases, we did not analyze whether the U.S. Supreme Court's abandonment of the "clear break" rule in the constitutional context should affect retroactivity analysis for non-constitutional changes.[77] In *Gordon*, the dissent did recognize the Supreme Court's decision to abandon the "clear break" rule as applied to rule changes based on federal constitutional grounds,[78] arguing that because the change in criminal procedure "could have been decided on federal constitutional grounds," the U.S. Supreme Court's decision in *Griffith* controlled.[79]

¶47 The "clear break" exception to the general rule of retroactive application was a failed attempt by the U.S. Supreme Court to limit the case-by-case nature of the *Stovall* balancing test. The U.S. Supreme Court abandoned the rule because of serious concerns about its workability and its disparate treatment of similarly situated defendants. Thus, our adoption of the "clear break" rule in *Norton*, where we cite exclusively to *Johnson* for support, was based on weak federal precedent that has since been abandoned. This makes it less persuasive and more susceptible to being overruled than precedent with a stronger foundation.

---

[75] 935 P.2d 503, 509 (Utah 1997) (holding that because "[t]here ha[d] been no rule covering the instance of a defendant who exhausted all of his peremptories subsequent to allowing a biased juror to sit," the new rule on this issue was not a "clear break" from the past and thus was retroactive).

[76] 2011 UT 36, ¶ 73.

[77] We do cite to *Griffith* in other opinions, applying its rule to federal constitutional issues. *See State v. Baker*, 2010 UT 18, ¶ 24, 229 P.3d 650 (applying a new constitutional rule retroactively to a case on direct review because "*Griffith v. Kentucky* eliminated the 'clear break' exception to retroactive application of newly declared constitutional rules for cases pending on direct review"); *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 912 n.9 (Utah 1993); *Stilling*, 770 P.2d at 143 (recognizing the rule announced in *Griffith* but refusing to apply *Long* retroactively because "[w]e decided *Long* on neither federal nor state constitutional principles, but rather as a result of our supervisory capacity over the lower courts"); *State v. Cantu*, 750 P.2d 591, 596 (Utah 1988).

[78] 913 P.2d at 359−60 (Stewart, A.C.J., dissenting).

[79] *Id.* at 359.

## 2. The "Clear Break" Rule Is Based on Weak Reasoning

¶48 Second, in addition to considering the precedent upon which a decision is based, we also consider whether in announcing the rule we "did the hard work of weighing all the arguments and reaching a reasoned conclusion."[80] Far from engaging in well-reasoned analysis, we first mentioned the "clear break" rule in dicta and failed to subsequently analyze it in a meaningful way. We also failed to address the significance of the U.S. Supreme Court's abandonment of the exception.

¶49 We initially referenced the "clear break" rule in dicta in *Norton,* where we considered whether a defendant who had been convicted of murder and sentenced to death could benefit from a change in criminal procedure that had been announced while his case was on direct appeal.[81] In our discussion of retroactivity caselaw in *Norton*, we affirmed our previous holding in *Belgard* but "stress[ed] that *Belgard*'s automatic rule of retroactivity only applies by its terms to criminal cases pending on direct review when the rule is changed."[82] "We also stress[ed] that *Belgard*'s automatic rule of retroactivity as to nonfinal judgments only applies to significant changes of rules that are *not expressly declared to be prospective in operation*."[83] We explained that this second "qualification [wa]s necessary to prevent automatic retroactivity from displacing the traditional rule that a new rule of criminal procedure which constitutes 'a clear break with the past' will sometimes be nonretroactive" and cited to *United States v. Johnson*.[84] We went on to say that "[a]n appellate court needs the latitude to immunize a

---

[80] *Eldridge*, 2015 UT 21, ¶ 28.

[81] 675 P.2d at 583–84. Specifically, the defendant argued that the standard of persuasion at the penalty hearing in his capital case should have been the higher standard announced in *State v. Wood*— "'beyond a reasonable doubt' both as to the fact that total aggravation outweighs total mitigation and as to the conclusion that the imposition of the death penalty is justified and appropriate." *Id.* at 583. At the defendant's trial, the jury was instructed that "[t]here [was] no fixed standard as to the degree of persuasion needed for a particular sentence." *Id.* (quoting jury instructions given at trial in accordance with Utah Code section 76-3-207, which was applicable at the time).

[82] *Id.* at 583.

[83] *Id.* at 584 (emphasis added).

[84] *Id.* (quoting *Johnson*, 457 U.S. at 549).

particular change of rule from the effect of automatic retroactivity in an appropriate case where this is consistent with constitutional principles."[85] We did not, however, analyze or apply the "clear break" rule.[86]

¶50  A close reading of this case suggests that, in referencing the "clear break" rule and in citing to *United States v. Johnson*, we did not intend to adopt the "clear break" rule. Instead, our citation to *Johnson* demonstrated that in certain instances it might be necessary for us to include an express declaration of prospective application to remain "consistent with constitutional principles."

¶51 But once the seed of the "clear break" rule was planted—possibly inadvertently—in *Norton*, it continued to grow in our caselaw, with little to no analysis, into the full expression of the rule. For instance, in *State v. Hoff* we stated that "[w]hen a new rule of criminal procedure constitutes a clear break with the past, it is not generally applied retroactively."[87] We cited *Norton* in support of this proposition along with other cases recognizing the validity of an express declaration of prospective application.[88] We then applied the "clear break" rule to a significant change in the law that was not made expressly prospective.[89] Despite our application of the rule, we failed to recognize that the U.S. Supreme Court had abandoned the "clear break" rule four years earlier in *Griffith v. Kentucky*.

¶52 Our most recent cases applying the "clear break" rule abandon any requirement of express language of prospective application and instead apply the rule as articulated in *Johnson*. In *State v. Baker*, we quoted *Johnson* extensively to articulate the "clear break" rule.[90] We went on to hold that the change in criminal

---

[85] *Id.*

[86] *Id.*

[87] 814 P.2d at 1123.

[88] *Id.* (citing *State v. Lafferty*, 749 P.2d 1239, 1259–61 (Utah 1988), where we "exercise[d our] inherent supervisory power to add two requirements to the penalty phases of capital trials" and then stated that "[t]hese requirements shall apply prospectively only"); *State v. Jonas*, 725 P.2d 1378, 1380 (Utah 1986) (refusing to give the *Long* decision retroactive effect when it "was specifically limited in its application to cases tried after its date of issuance")).

[89] *Hoff*, 814 P.2d at 1123−24.

[90] 935 P.2d at 508–09.

procedure in *Baker* was not a "clear break" because there was no initial rule to break from.[91] Most recently, in *State v. Lovell* we cited *Hoff* and *Baker* to articulate the "clear break" rule.[92] In *Lovell*, we concluded that because "the current standard fundamentally alters a defendant's rights, we decline to retroactively apply the current formulation of rule 11 to Mr. Lovell."[93] In neither of these cases did we recognize that the U.S. Supreme Court had overruled the "clear break" rule or analyze the rule in a meaningful way.

¶53 Far from doing "the hard work of weighing all the arguments and reaching a reasoned conclusion," we first cited the "clear break" rule in dicta and subsequently applied it without analyzing the retroactivity issue in a meaningful way. We also failed to address the significance of the U.S. Supreme Court's abandonment of the rule in the constitutional context. Because the "clear break" rule is based on weak federal precedent that has subsequently been overruled and because it was not based on a well-reasoned analysis by this court, we conclude that it is not persuasive. Thus, it is less weighty and more susceptible to being overruled than it would be if we had fully analyzed the issue and explicitly chosen to apply the "clear break" rule despite its having been abandoned by the U.S. Supreme Court.

*C. The "Clear Break" Rule Has Not Become Firmly Established*

¶54 Having concluded that the "clear break" rule was based on weak precedent that has since been overruled and was not well-reasoned, we now turn to the second factor we use to determine the weight of precedent. Under the second factor, we look to a range of considerations to determine "how firmly the precedent has become established in the law since it was handed down."[94] These considerations include "the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned."[95] Below, we consider each of these factors in turn and conclude that the "clear break" rule is not firmly established in the law and thus is not of weighty precedential value.

---

[91] *Id.* at 509.

[92] 2011 UT 36, ¶ 73.

[93] *Id.* ¶ 74.

[94] *Eldridge*, 2015 UT 21, ¶ 22.

[95] *Id.*

1. Age of the Precedent

¶55 First, in deciding whether a precedent has become firmly established, "we look to the age of the precedent[] since newer precedents are likely to be less firmly established."[96] As discussed above, the "clear break" rule first appeared in our caselaw in *Norton* in 1983[97] and was arguably not actually adopted until *Hoff* in 1991.[98] Therefore, it has been part of our jurisprudence for at least twenty-four years. While this may seem a significant amount of time, it is a relatively recent development when one considers that "the fundamental rule of retrospective operation," to which the "clear break" rule was an exception, had "governed [j]udicial decisions . . . for near a thousand years."[99] Similarly, in *Eldridge v. Johndrow*[100] we found that precedent that had been on the books for thirty-two years was not firmly established when it was not rooted in long-established legal principles. In that case, we decided to overturn *Leigh Furniture & Carpet Co. v. Isam* in which we held that an "improper purpose . . . [would] support a cause of action for intentional interference with prospective economic relations even where the defendant's means were proper."[101] *Leigh Furniture* was thirty-two years old, and in deciding to overturn it we noted that it was "not based on a legal principle established in the earliest days of statehood" unlike precedent we had upheld.[102] While it is not necessary for precedent to be thousands of years old or date back to the time of statehood to be firmly established, here where the "clear break" precedent is a relative newcomer to well-established law on retroactivity and has not firmly taken root in our jurisprudence,[103]

---

[96] *Id.* ¶ 34.

[97] 675 P.2d at 584.

[98] 814 P.2d at 1124–25.

[99] *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 94 (1993) (alteration in original) (internal quotation marks omitted).

[100] 2015 UT 21, ¶¶ 34, 64.

[101] 657 P.2d 293, 307 (Utah 1982).

[102] *Eldridge*, 2015 UT 21, ¶ 34 (internal quotation marks omitted).

[103] We have applied the "clear break" rule only a handful of times. *See Lovell*, 2011 UT 36, ¶¶73−74; *Baker*, 935 P.2d at 508−09; *Gordon*, 913 P.2d at 354; *State v. Chapman*, 921 P.2d 446, 450 n.6 (Utah 1996); *Menzies*, 889 P.2d at 406 n.7; *Hoff*, 814 P.2d at 1124−25; *State v. Hickman*, 779 P.2d 670, 672 n.1 (Utah 1989); *Norton,* 675 P.2d at 584. And the Utah Court of Appeals has applied the rule in very few

the age of this rule does not demonstrate that it has become firmly established in our law.

## 2. Workability

¶56 We also consider "how well [the precedent] has worked in practice" when determining its weight.[104] The "clear break" rule is vague and difficult for courts to apply. It requires the court to ask whether a decision "explicitly overrules a past precedent . . . or disapproves a practice [we] arguably ha[ve] sanctioned in prior cases."[105] While those instances where we explicitly overrule past precedent regarding a rule of criminal procedure are easy to identify, those instances where we disapprove of a practice that we have "arguably" sanctioned in prior cases are much less so. The later analysis requires the court to look at all of our past caselaw on a subject and decide whether we "arguably" have sanctioned a particular practice. This is an arduous task,[106] one that introduces a level of unpredictability that is not appropriate when dealing with the application of critically important rules of criminal procedure.

## 3. Consistency with Legal Principles

¶57 In addition to considering the precedent's age and workability, we also look to its consistency with other legal principles when deciding whether it has become firmly established.[107] The "clear break" rule is in tension with two important legal principles. First, the "clear break" rule does not address the root policy concerns that arise when we decide retroactivity on a case-by-case basis. As noted by the U.S. Supreme Court in *Griffith*, the "clear break" rule creates many of the same issues that the Court was concerned about under the *Stovall* factors—it goes against the "principle that [the court] does not disregard current law[] when it adjudicates a case pending before it on direct review," and it may treat similarly situated defendants differently.[108]

---

cases. *See State v. Guard*, 2013 UT App 270, ¶¶ 15−19, 316 P.3d 444; *State v. Vasilacopulos*, 756 P.2d 92, 94 (Utah Ct. App. 1988).

[104] *Eldridge*, 2015 UT 21, ¶40.

[105] *Baker*, 935 P.2d at 509 (internal quotation marks omitted).

[106] *See cf. Teague v. Lane*, 489 U.S. 288, 301 (1989) ("It is admittedly often difficult to determine when a case announces a new rule . . . .").

[107] *Eldridge*, 2015 UT 21, ¶ 22.

[108] *Griffith*, 479 U.S. at 326–27.

¶58 While we recognize that *Griffith* does not apply directly to non-constitutional changes in criminal procedure, we find its logic equally persuasive in the non-constitutional context. Even in the non-constitutional context, new rules of criminal procedure may implicate a defendant's right to a fair trial. The new rule in *Clopten* demonstrates this. Although *Clopten* was not decided on a constitutional basis, the rule it creates does impact a defendant's ability to present eyewitness expert testimony to the jury. In cases, such as Mr. Guard's, where a defendant's conviction is based heavily on eyewitness testimony, the ability of the defendant to present such a witness to the jury can be critically important—although not constitutionally required. Also, given that non–constitutionally based changes in criminal procedure can implicate important rights of defendants, the problem of treating similarly situated defendants differently is also troubling. We agree with the court of appeals reasoning in this case that "it seems inconsistent with the administration of justice to deny Guard the benefit of [our] approach in *Clopten*" when the two cases present very similar issues and were tried contemporaneously.[109]

¶59 Second, selective retroactive application of new rules is in tension with the exercise of our judicial power.[110] Indeed, the U.S. Supreme Court abandoned the "clear break" rule in *Griffith* in part for this reason. The Court concluded that "'the nature of judicial review' strips us of the quintessentially 'legislat[ive]' prerogative to make rules of law retroactive or prospective as we see fit."[111] It found that "the nature of judicial review" "preclude[d] [it] from [s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases to flow by unaffected by that new rule."[112] When exercising our judicial power, we resolve

---

[109] *Guard*, 2013 UT App 270, ¶ 19.

[110] *But see Kennecott Corp. v. State Tax Comm'n*, 862 P.2d 1348, 1352 (Utah 1993) (recognizing in the civil context that "retroactive or prospective operation is not a question of judicial power but instead depends solely upon an appraisal of the relevant judicial policies to be advanced" (internal quotation marks omitted)).

[111] *Harper*, 509 U.S. at 95 (alteration in original) (quoting *Griffith*, 479 U.S. at 322).

[112] *Griffith*, 479 U.S. at 323 (third alteration in original) (internal quotation marks omitted).

concrete disputes presented by parties and interpret the law.[113] Therefore, when we decide cases we correctly interpret the rules of criminal procedure, and these interpretations should apply retroactively to cases on direct review. The appropriate method for our prospective decision making in this area is through our rulemaking process.[114]

4. Reliance Interests

¶60 Finally, in deciding the weight of a precedent "we consider the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned."[115] The policy rationale for considering reliance interests is rooted in fairness.[116] Under the

---

[113] *See Timpanogos Planning & Water Mgmt. Agency v. Cent. Utah Water Conservancy Dist.*, 690 P.2d 562, 569 (Utah 1984) ("[We] investigate[], declare[] and enforce[] liabilities as they stand on present or past facts and under laws supposed already to exist. . . . [We] are interpreters of law."(internal quotation marks omitted)). The important exception to this general rule is matters of common law, where judges do in fact make the law. *State v. Walker*, 2011 UT 53, ¶¶ 31−33, 267 P.3d 210; *see also Jones v. Barlow*, 2007 UT 20, ¶ 61, 154 P.3d 808 (Durham, C.J., dissenting) ("[B]y definition, the common law is judge-made law. . . . Thus, the judicial role in a common law system is not solely to apply legislative enactments. Where the legislature has not acted, we frequently exercise the power to articulate rights and obligations that have not previously been recognized." (internal quotation marks omitted)). But the common law has largely been displaced in the area of criminal procedure by our rules of evidence and criminal procedure. *See* R. COLLIN MANGRUM & DEE BENSON, MANGRUM & BENSON ON UTAH EVIDENCE 1−4 (2014) (discussing the displacement of the common law of evidence with the Utah Rules of Evidence).

[114] *See Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 149, 289 P.3d 369 (Lee, J., dissenting) ("[W]e have settled mechanisms for exercising [our supervisory] power when it impacts established rules of evidence and procedure. When we see a need to adapt our rules, we do so through a structured amendment process that involves the advisory committees we have appointed for that purpose, with time and opportunity for comments from the bench and bar in an orderly process of amendment. We follow that process for good reason.").

[115] *Eldridge*, 2015 UT 21, ¶ 35.

[116] *See Cope v. Utah Valley State Coll.*, 2014 UT 53, ¶ 19, 342 P.3d 243 ("[P]eople should know what their legal rights are as defined by

"clear break" rule, the main reliance interests are those of the State, which will have to give criminal defendants the benefit of new rules of criminal procedure announced while the defendant's case is on direct review. While the State's interests are certainly important, they are not the type of public reliance interests we traditionally protect most strongly.[117] And the interest of the State does not outweigh the interests of criminal defendants in obtaining the benefit of new rules of criminal procedure.[118] Also, the impact on the State will be mitigated by the fact that in abandoning the "clear break" rule we will be requiring retroactive application of changes in criminal procedure only to a narrow class of cases: those cases on direct review at the time the new rule is announced. Further, even if a new rule applies retroactively, defendants still have to demonstrate that it should apply to the facts of their case and that denial of the new rule was not harmless error. This can be a substantial hurdle, as demonstrated by the case at hand. Despite receiving the benefit of our decision in *Clopten*, Mr. Guard has not shown that the trial court abused its discretion in not admitting Dr. Dodd's testimony (as discussed in the next section).

¶61 In sum, the "clear break" rule has not become firmly rooted in our caselaw because it is a relatively recent development in light of the long tradition of retroactive application of judicial decisions, it is difficult to apply in practice, it is inconsistent with other important legal principles, and the State's reliance interests do not outweigh the interests of criminal defendants in the application of new rules of criminal procedure to their case. We therefore conclude that the "clear break" rule is neither persuasive nor firmly rooted in our caselaw and is thus more susceptible to being overturned than better-reasoned and more firmly established precedent. Because of

---

judicial precedent, and having conducted their affairs in reliance on such rights, ought not to have them swept away by judicial fiat." (internal quotation marks omitted)).

[117] *See Id.* (framing the reliance assessment as whether overturning precedent would "undermine the public's substantial reliance upon an established legal principle").

[118] *See Harper*, 509 U.S. at 121 (O'Conner, J., dissenting) ("[N]onretroactivity in criminal cases historically has favored the government's reliance interests over the rights of criminal defendants. As a result, the generalized policy of favoring individual rights over governmental prerogative can justify the elimination of prospectivity in the criminal arena.").

the flaws in the "clear break" rule detailed above, we now abandon it and instead hold that new rules of criminal procedure announced in judicial decisions apply retroactively to all cases pending on direct review.

## II. Under *Clopten*, the Trial Court Did Not Abuse Its Discretion in Denying the Admissibility of Mr. Guard's Eyewitness Expert Testimony

¶62 Having determined that *Clopten* applies to cases on direct review, we now apply it to Mr. Guard's case and hold that the trial court did not abuse its discretion in concluding that Mr. Guard's eyewitness expert testimony was unreliable and thus inadmissible under rule 702[119] because he failed to make clear to the court what this testimony would include. In *Clopten*, we declined to create "a new rule establishing eyewitness expert testimony as presumptively admissible."[120] Instead, we clarified that "the testimony of a qualified expert regarding factors that have been shown to contribute to inaccurate eyewitness identifications should be admitted whenever it meets the requirements of rule 702 of the Utah Rules of Evidence."[121] Further, we recognized that "trial judges perform a gatekeeper function to screen out unreliable expert testimony and are advised to view proposed experts with 'rational skepticism.'"[122]

¶63 Although we did "hold that, in cases where eyewitnesses are identifying a stranger and one or more *established factors* affecting accuracy are present, the testimony of a *qualified expert* is both reliable and helpful, as required by rule 702,"[123] in so holding we did not strip trial judges of their "gatekeeper" role. Under *Clopten*, the trial court must still apply rule 702 and decide whether the proposed eyewitness expert "is qualified as an expert by knowledge, skill,

---

[119] We note that although the current rule 702 of the Utah Rules of Evidence was not in effect when Mr. Guard was convicted, we have previously held that "the old Rule 702 plus *Rimmasch* test yields the same result as the current rule when applied to eyewitness expert testimony." *State v. Clopten*, 2009 UT 84, ¶ 38, 223 P.3d 1103 (internal quotation marks omitted). Therefore, we proceed with our analysis under the current version of rule 702. The stylistic changes made to rule 702 in 2011 also do not affect our analysis.

[120] *Id.* ¶ 30.

[121] *Id.*

[122] *Id.* ¶ 31.

[123] *Id.* ¶ 49 (emphasis added).

experience, training, or education";[124] and the judge must also decide whether the specific testimony that the eyewitness expert proposes to offer to the jury is reliable.[125]

¶64 The burden is on the party "wishing to rely on the expert's testimony" to establish that the testimony it would like to offer is reliable.[126] The party can do this either by arguing for judicial notice and demonstrating that the testimony they propose is based on "generally accepted" principles and methods[127] or by making "a threshold showing that the principles or methods that are underlying in the testimony are reliable."[128] The proponent of the evidence must make a higher showing of reliability when arguing for judicial notice than when arguing for admission under 702(b). In order to obtain judicial notice, the party must show that the testimony they propose is "generally accepted by the relevant expert community."[129] This is a higher showing than the mere "threshold showing" of reliability that is required under 702(b). A "threshold showing"[130] of reliability requires "only a basic foundational showing of indicia of reliability."[131]

¶65 Under this framework, Mr. Guard had the burden of showing that the testimony his eyewitness expert planned to present to the jury was reliable. Our decision in *Clopten* did not negate this requirement. One critical step in this process is telling the court *what* testimony the expert will provide.[132] *Clopten* did not sweep so

---

[124] UTAH R. EVID. 702(a).

[125] *Id.* 702(b).

[126] *See State v. Perea*, 2013 UT 68, ¶ 72, 322 P.3d 624.

[127] UTAH R. EVID. 702(c).

[128] *Id.* 702(b).

[129] *Id.* 702(c).

[130] *Id.* 702(b).

[131] *Id.* 702 advisory committee note.

[132] *See id.* ("[T]he gatekeeping trial judge must take care to direct her skepticism to the particular proposition that the expert testimony is offered to support. The Daubert court characterized this task as focusing on the 'work at hand.' The practitioner should equally take care that the proffered expert testimony reliably addresses the 'work at hand,' and that the foundation of reliability presented for it reflects that consideration.").

broadly as to hold that *any* eyewitness expert testimony is automatically admissible as reliable and helpful. Instead, we specifically stated that this expert testimony must be offered by a "qualified expert" and must concern "established factors" affecting the accuracy of eyewitness testimony;[133] and that trial judges retain their "gatekeeper function to screen out unreliable expert testimony."[134] We noted some "established factors" in our opinion[135] but in so doing did not intend to etch these factors on a stone tablet. Indeed, as we recognized in *Clopten*, research in the area of eyewitness identification is an evolving science. Thus, it is the responsibility of the proponent of such testimony to establish its reliability, and the trial court's role to evaluate its reliability, at the time of trial. And we review the trial court's evaluation under an abuse of discretion standard.

¶66 Therefore, under *Clopten*, proponents of evidence under rule 702 still must show that the eyewitness expert testimony they intend to present to the jury is reliable. It was not an abuse of discretion for the trial court to hold that Mr. Guard failed to make this showing. Mr. Guard's notice of intent to call an expert witness described the testimony broadly as "concerning the full range of cognitive processes associated with the eyewitness, including attention, perception and memory." The trial court and the State each expressed confusion during both the initial motion hearing and the subsequent *Rimmasch* hearing about what testimony Mr. Guard's proposed expert anticipated presenting to the jury. At the end of the *Rimmasch* hearing, Mr. Guard offered to provide "a two-page synopsis" of the proposed testimony to both inform the trial court of the scope of the proposed testimony and allow the State to respond. He failed to provide the synopsis, however, and "[a]t, or just prior to trial, the Court, having received no supplemental briefing by the Defendant granted the State's Motion to Exclude Defendant's Expert Witness from the bench." Because Mr. Guard failed to even tell the trial court what factors affecting eyewitness identification his eyewitness expert was going to testify about, let alone demonstrate that this testimony related to established factors affecting eyewitness testimony, it was not an abuse of discretion for the trial court to deny his motion to call Dr. Dodd.

---

[133] *Clopten*, 2009 UT 84, ¶ 49.

[134] *Id.* ¶ 31.

[135] *Id.* ¶ 32 & n.22.

**Conclusion**

¶67 We conclude that the "clear break" rule is seriously flawed and so abandon it in favor of a rule of retroactive application to all cases pending on direct review of new rules of criminal procedure announced in judicial decisions. Because Mr. Guard's case was on direct review at the time we issued *Clopten*, we apply our rule in *Clopten* to his case and conclude that it was not an abuse of discretion for the trial court to exclude Dr. Dodd's expert testimony. Therefore, we reverse the court of appeals' decision and uphold that of the trial court.

———————